Good morning and may it please the court. My name is Sylvia Wu, appearing on behalf of Petitioner Center for Food Safety. I'm going to try to save four minutes of my time for rebuttal. Today, imitation meat products that promise the look, taste, and feel real meat are being sold all over the country. We asked the court to vacate FDA's decision to approve soy lehemoglobin, a novel chemical mass-produced through genetic engineering that up until now has never been part of our diet. And there is a good reason why. Its primary purpose is to give imitation beef products the reddish color of real beef. Counsel, perhaps before you get into the merits, I have some grave concerns about standing. And if we are to find standing here, it just seems like everyone can have standing. And the closest cases that I find to your situation are in environmental cases. But can you give me your best argument on standing and why, give me your best argument on that and why we're not opening the gate to every single person in the world to have standing. I mean, it has to have some meaning, and I'm having trouble with that here. Sure, I'm happy to do that, Judge Callahan. First of all, this is a procedural case, like a lot of environmental cases. So, it's clear that all we have to show is that there's a reasonable probability of harm or a credible threat. And so, our member declarations have shown that in their particular circumstances. So, we're not opening... But what is that credible threat? What precisely is the threat? Isn't it avoidable? The products are labeled. One can decide not to take this product? The credible threat here are in two forms. One, a health injury. And two, the cost of avoiding that, Judge O'Scanlan, you mentioned. That actually is an economic injury. I point the court to Monsanto v. Gearson, where the Supreme Court held that farmers who have to avoid potential contamination and incur additional costs for testing for genetic engineering seeds, that those economic costs qualify as an injury to a consumer who's concerned about the safety of their food. I have some follow-up questions. By not purchasing impossible products and purchasing a different ersatz meat product, I don't recall that there's evidence that that is a more expensive alternative as distinct from just a different alternative. Is there such evidence? There isn't such evidence, I think, that our members allege to, but it's not really about... It's not about the comparison of costs. Rather, it's the avoidance costs itself of having to search for different products, having to relabel. And Judge Graber, if I may add... Well, it's quite different from a farmer's situation, because you're going to go to the health question, because as I understand the affidavits, basically, the members of the organizations are concerned, but their concern doesn't seem to have any sort of firm, factual basis. Does that matter? Well, their concerns do have a firm, factual basis in the record. For example, our member, Ms. Marker, who is a cancer survivor, she points out in her declaration, this is appendix 80 to 84, that in the record, what we have is a 28-day study that showed the potential statistically significant effects that indicate potential risk of cancer, which obviously concerns her as a cancer survivor. In the same way, going back to the avoidance of costs point, Ms. Judge Graber, that you started with, in addition to Gearson, I would point the court to lay law, where the Supreme Court said, where there was no evidence of pollutants in the river, but there the members' subjective fear of potential harm from the river looking dirty was sufficient, and the fact that they stopped using the river, avoiding it for their recreational purposes, that was sufficient to establish standing in that case. We have the same situation here with our members' consumer interests and having to avoid this product, and it's not just about avoiding impossible burger. FDA's color approval at ER5 is broader than that. It's for all meat analog, imitation meat products, what they refer to as meat analog products. It's about the fact that our members will have to go to the store and read ingredient lists and carefully taking the time in order to avoid this product, and that is already happening. These some conjectural, non-factual harm, we've met the reasonable probability test of showing injury that's needed here. But the consumer still has choice. The consumer can decide either to buy this one or not. It's not like having to go to the river where you have no choice. It's either the river is contaminated or not, but here there are various products that are available, so you can exposure to what you consider to be a contaminant. And that avoidance comes with the cost. It comes with the cost of finding the right stores that don't carry these products. It takes more time and effort for them to avoid this product. So it's not about the fact that there are other choices. If you look at lay law, it says it's the avoidance cost itself. Well, I'm just sort of everything that's on the shelf meet my standards, and if it doesn't, then I can sue. Because, you know, there's things out there. We all sort of have different standards and, you know, but, you know, like I remember my mother would send me articles when I was in college, don't eat yogurt because it causes cataracts in rats. Well, I chose to eat yogurt, and we're still eating yogurt, and I have no cataracts. But, you know, I'm just, it just seems like they could just go and say, well, I would like someone to make that in a way that would make me comfortable, and therefore I can sue them if I'm not comfortable. Well, Judge Callahan, I think the difference here is these are particular members of particular health concerns, and particular consumer interest. Well, that's certainly true. A banker is your best friend, because she does have something more than just a generic vague concern because of her cancer, but I would, if my colleagues are okay with it, I would appreciate hearing your best pitch on the merits before you run out of time. That's fine. I'm fine with that. Thank you. Same here. Thank you. So, very quickly, FDA here failed to make the required safety findings for two reasons. First, FDA violated its own regulation. Under the color additive regulation, FDA was required to find with convincing evidence that the product... You've cherry picked a couple of stray phrases, it seems to me, but reading the document as a whole, they state the correct standard, they apply the correct standard, and there are a couple of, you know, phrases that you, but it seems to me that they're being read out of context. So, what is your response to that? Your Honor, it's true that here and there FDA cites the correct standard. Every time FDA starts with the color additive, it says the standard requires convincing evidence, but if you look at ER4, which is where FDA really explains what it seems is a safety standard, it's not just a clerical error or omission. FDA starts by first reciting the correct standard. But, counsel, when you read the part that ends up with the safety evaluation, it clearly states that there's convincing evidence with reasonable certainty. So, regardless of the chat in the earlier sections, it seems to me that the actual safety evaluation, you don't agree with that resolution, but it seems to me that the agency used the correct standard in the actual evaluation portion. Well, in the actual evaluation, if you look at the, FDA cites the fact that they, the two scientist memos. The scientist memo, this is at ER325, actually states only with reasonable certainty, and FDA quotes this language in its brief at BR25, at page 25. It doesn't say with convincing evidence. Same thing. But you're mixing up two things. One is you're saying, I mean, what I'm hearing now is that there wasn't, that the FDA was wrong on the merits because it found something convincing that wasn't convincing. But in terms of applying this, the correct standard, if you look at ER144, FDA says there is convincing evidence establishing with reasonable certainty. So, that's the correct standard. And it seems to me that your main argument really is, well, they were wrong. Our argument is that they didn't apply the correct standard, and that here and there, whenever they recite the actual regulation, they recite it in full with the correct language, yet when they make their safety determination, they say it's the same. That it's the same for again, I guess I just don't read it the same way. I read it as saying that the term safety has the same meaning for color additives as others. And that seems to be true. It's the burden of proof that's different. The plain language is different. The plain language of one has the burden of proof. It is not different on the word safety. And so, I think, again, I'm just having a hard time reading it the way you're reading it, I guess. Sure. I guess if you look at the plain meaning of what the burden of proof requires, Judge Weber, convincing evidence in criminal law context is always known to be a very high burden, whereas reasonable certainty is considered to be a much lower standard. These phrases aren't defined by the regulations. So, therefore, their plain meaning controls here. The plain text includes convincing evidence. The plain meaning of convincing evidence is higher than reasonable certainty. So, it is not the same standard. I just want to wrap up and reserve the rest of my time for rebuttal if I may, but just quickly say that besides the convincing evidence standard, which is, in our view, a pure reversal of legal error, FDA also fails to meet the substantial evidence standard by ignoring its own scientific expertise, ignoring the guidelines, its self-testing requirements, and its self-call for. So, that's a separate ground for vacating the decision here. Thank you, counsel. You may reserve the remaining time. Thank you. And we'll hear next from the chairman who wants to go first. Good morning. Maeve, police and court. Dennis Fan here on behalf of the United States. I just wanted to pick up at the end of the discussion about the standard that FDA applied. FDA, as Judge Graber noted, in multiple instances applied the convincing evidence standard. They stated that on page 4 and page 144 of the excerpts of record. And it's not just that they stated the standard. They then walked through that evidence and addressed why that was convincing. And so, for the next several pages in each of the regulatory dockets, the FDA goes through, they go through how this is similar in molecular structure to other types of safe hemoglobins. They go through why there's no harmful components in their safe amounts of iron and protein. They go through why there's studies showing no genetic damage or genetic mutations or allergic effects. All of that demonstrates that FDA really is applying the correct standard and really is finding that there is convincing evidence that there's a reasonable certainty of no harm. And FDA says that in different ways throughout the document. It says that the petitioner, the administrative proceedings, that Impossible thoroughly addressed the safety of its product. And it says that it's specifically evaluating this as a color additive again on page 4 of the record. What is your response to the argument that the study didn't follow every statement in the Redbook description of how a study should be done? So, the Redbook, you can justify departures from the sort of standards within the Redbook. And the Redbook has a few types of rat feeding studies. One's a subchronic study and one's a short-term study. And I think if you look at page 5 of the excerpts of record, and on the left-hand column in the Federal Register document, the FDA talks about why it was fine to do a shorter-term study with fewer rats here. And that's because this is a type of protein that rapidly digests in the stomach. So, if you have something that digests between half a minute to two minutes, the results of that, FDA and the FDA scientists think, are going to be pretty readily apparent. The reason you want a longer-term study is if something doesn't have that sort of immediate effect. And the reason you want to have more rats is because if you have a longer-term study, well, rats sometimes die of natural causes that are unrelated to the product that's being tested on them. So, if you have a long study, you want to have more rats in the study to make sure that there's a survivability aspect, that enough rats survive, that you're going to get good data out of all of this. But all of this just demonstrates that this is one small piece of the overall picture that FDA looked at. Petitioner's challenge, Center for Food Safety's challenge, is one, about whether FDA has substantial evidence in the record. And certainly having one 14-day rat study and two 28-day rat studies, plus a host of other scientific studies, is substantial evidence. It's more than substantial evidence. And even if they poked holes in one particular type of scientific rat study, I mean, that's well within the agency's expertise about why that particular rat study is good enough. But also, it doesn't really actually get them to any amount of success on a substantial evidence challenge. So, I mean, there's other aspects of the rat feeding study that they have objected to. But FDA, and again, I would really commend to you the regulatory explanation on page five about why this particular rat feeding study was sufficient. And I'd also commend Dr. Chowdhury's assessment. If you ever want to know about the thorough scientific basis for Dr. Chowdhury, starting on page 320 of the record, walks through every single piece of evidence, says why in his scientific judgment there's absolutely no adverse health consequence that's demonstrated by any piece of evidence in the record, and then at the end of the day says, look, I've surveyed the scientific landscape and there's no safety concern here. And that's the basis for the FDA's decision. So whether there's one rat study that Center for Food Safety believes could have been done better, or if there's one or two lines in FDA's regulatory documents that could have been more clear, what is clear is there's a safety threshold and FDA has gone through everything that it needs to do in terms of analyzing the science, explaining the science in the regulatory documents, and then reaching an ultimate scientific conclusion that the FDA deserves a substantial amount of deference on. If there are no further questions, I'm happy to just speed the rest of my time as well. I don't believe I see any questions on the horizon for you. Thank you. Thank you, your honors, and may it please the court. I'm Kate Stetson representing the intervener Impossible Foods. I'd like to start with the standing issues that each of establishes standing, even without resort to some novel theory or any adoption of the second standing in consumer food and safety cases. Basically, she says, listen, your studies show elevated globulin that's associated with cancer. I have cancer. I used to eat these. I want to be assured of a better safety look. Why isn't that just sort of an ordinary kind of injury? I ate it and I've read something that suggests that it's problematic for me and I would like to go back to eating it again because it was good. Why doesn't that establish standing? Judge Graber, first, I agree with you that of the declarations, the maker declaration comes the closest. We say as much in our brief. I think the issue is that the Graber declaration itself doesn't rely on any evidence. Not mine. I think you mean the maker declaration. The maker declaration, not the Graber declaration. It does not rely on any evidence that is scientifically or clinically based. I want to contrast that. It does describe the elevated levels found in the rats and talks about that associational with inflammation and cancer. Is it your position that you have to have absolute 100% perfect scientific evidence before you have standing? No. What if your own personal land has polluted water coming on it from a source? You say, well, I think that whatever this substance is in the water coming onto my land is going to cause a problem because of some study that is in the record. Do you have to bring in all the scientists to have standing? This is like that, it seems to me, where it's not on her land, it's in her body. Judge Graber, it's not like that because the increases in the globulin values to Ms. Maker refers are a reference to essentially a blog post. I want to contrast that with the evidence that actually could have come forward. This is the NRDC versus EPA case that the petitioner relies quite heavily on. It involves a nano silver coating of a textile. If you look into that record, there is a declaration that is 10 pages long that cites 10 different articles in nine different peer-reviewed journals. Back to my example, there's a pollutant in the water, there's no question that it's in there. Substance X is in the water that comes onto my property. I say, here's an article that says this is potentially a problem. I want this water off my land. I don't understand why that's an issue of standing at that point rather than an issue of the merits. Right. I think, Judge Graber, there are a couple different answers. The first is with respect to the laid law type analogy you're using, those situations are ones where the water looks and smells polluted. That's what the plaintiffs were saying in laid law. But more to the point- I'm not talking about laid law. I'm not talking about laid law because that isn't a scenario in my hypothetical. To Judge O'Scanlan's point though, and this is why it if you have water on your property that is polluted, you can't avoid that polluted water. That was Judge O'Scanlan's point earlier. If you have the option to purchase an impossible burger at a grocery store that also carries other meat analogs, you can avoid it. And if you can't avoid it, what you need to do is to show- She can't avoid what she already ate. She ate them. She isn't just saying she might eat them. She ate them. And that she can't undo. She is saying that the study, according to the blog post that the center cites, may increase inflammatory disease and cancer. That is a speculative, hypothetical, future-looking injury. And that is emphatically not what this court's precedents tolerate under Zappos or with respect to the reasonably probable standard that Ms. Wu cited herself. This is exactly, to Judge Callahan's point, the sort of case where these declarations are so anemic that if you were to permit standing here, Katie, bar the door for all of the cases involving issues like this. Thank you, counsel. Your time has expired. And I believe Ms. Wu has some rebuttal time remaining. I have one question. Did Mr. Phan cede some time to Ms. Stetson? I don't know it. Well, we can do that if you'd like. We normally separate out the time for- Okay. I wasn't sure. But we certainly can do that if you have more questions for Ms. Stetson. I don't. Judge O'Scanlan, do you have further questions for Ms. Stetson? No, I don't. Okay. So we'll hear rebuttal from Ms. Wu. Yes, Your Honor. Just a couple of points. First, on standing, as Your Honor pointed out, the health risks here are particular to our members. They include blood clot risks. They include cancer risks. And this isn't a risk that can be avoided. It's already occurring. Ms. Marker will come across them. She could go to a cookout where that's the only item that's served. And if the test is that you can simply avoid health risk, then, you know, any, even in the endangered species contact, any member- Well, I know. But if you go to a cookout and they're serving peanuts and you have a peanut allergy, you don't eat peanuts because that's the only thing they serve. I don't, I'm not buying that part of this. I think that the maker is the best one, but I, the question is, is it enough? Counselor, I'd like to ask your view. Oh, I'm sorry. Go ahead. I'll let you ask your question. Yes. Sorry. Oh, well, I don't want to interrupt my colleague. No, you go ahead and jump yours in and she can do both of them at the same time. Oh, okay. All I just want to know is what's your take on the Coalition for Mercury-Free Drugs case? I think all those cases show that we actually meet the standing and just like in Raised Apples, there, there was only identity theft in the court, like the risk of identity theft, and that was enough. Here, the health risks are happening. She's already eaten them, and that's more than enough, more than the member declarations there in that case. If I can quickly move on to the merits on the convincing evidence standard, this isn't our words. This is FDA's words. FDA time and time again said in their view, the safety standard is the same. This is ER4 in their brief at page 10. Counsel, the meaning of the word safety is the same, but that doesn't mean the burden of proof to demonstrate safety is the same. And I don't understand how you conflate those things. The burden of proof is written into the very definition of safety. That's right. Well, but the word safety taken alone, something is either safe or it's not. And somebody has to prove it by a certain quantum of proof, but it doesn't change the meaning of what is safe. And that's what I'm trying to get you to focus on. And here, the record isn't clear that they met the convincing evidence standard. In fact, it's the contrary. They have mostly the same materials. They rely on the same materials that was used to prove that it's generally recognized as safe, far short of convincing evidence. They have, you know, FDA says it's more than just a rat study that they rely on. What else do they rely on? They cite to this in their brief at page 25. It's many of the materials that FDA itself rejected before that soybean is safe. Counsel, you have exceeded your time. And I think we do understand your position. Okay. If I may just close by saying that this is the only one time that FDA reviews color additives. There isn't a periodic review coming up. FDA needs to make sure it meets the burden of proof and has substantial evidence at this scope. There isn't another round of this. And that's why the decision should be vacated. Thank you so much. Thank you, counsel. The case just argued is submitted. And once again, we appreciate the arguments from all three of you. They've been very helpful in this interesting appeal. We are adjourned for this morning's session.
judges: O'scannlain, Graber, Callahan